RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0209p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MOLLIE SLAYBAUGH; MICHAEL SLAYBAUGH,

　　　　　　　　　*Plaintiffs-Appellants*,

　　*v.*

RUTHERFORD COUNTY, TENNESSEE; RUTHERFORD COUNTY SHERIFF'S DEPARTMENT; TOWN OF SMYRNA, TENNESSEE,

　　　　　　　　　*Defendants-Appellees*.

> No. 23-5765

─────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:23-cv-00057—Aleta Arthur Trauger, District Judge.

Argued:  May 9, 2024

Decided and Filed:  September 3, 2024

Before:  BUSH, NALBANDIAN, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Jeffrey H. Redfern, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellants.  Nick Christiansen, HUDSON, REED & CHRISTIANSEN, PLLC, Murfreesboro, Tennessee, for Rutherford County Appellees.  Robert M. Burns, HOWELL & FISHER, PLLC, Nashville, Tennessee, for Appellee Smyrna, Tennessee.  **ON BRIEF:**  Jeffrey H. Redfern, Suranjan Sen, INSTITUTE FOR JUSTICE, Arlington, Virginia, Daniel A. Horwitz, HORWITZ LAW, PLLC, Nashville, Tennessee, for Appellants.  Nick Christiansen, HUDSON, REED & CHRISTIANSEN, PLLC, Murfreesboro, Tennessee, for Rutherford County Appellees.  Robert M. Burns, Hannah G. Moore, HOWELL & FISHER, PLLC, Nashville, Tennessee, for Appellee Smyrna, Tennessee.  Erich R. Eiselt, INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION, Rockville, Maryland, for Amicus Curiae.

---

**OPINION**

---

JOHN K. BUSH, Circuit Judge.  James Conn murdered Savannah Puckett.  His parents, Mollie and Michael Slaybaugh, were among those who suffered the consequences.  Police damaged the Slaybaughs' home while arresting Conn.  The Slaybaughs filed this action under 42 U.S.C. § 1983, seeking to recover for property damage caused by law enforcement's actions.  At issue is whether they are entitled to compensation under the Takings Clause of the Fifth Amendment or its analogue under the Tennessee Constitution.  Because they are not, we affirm the judgment of the district court.

**I.**

The Slaybaughs' residence is in the Town of Smyrna, located in Rutherford County, Tennessee.  On January 23, 2022, they agreed to let Conn stay at their house.  There, later that evening, Mrs. Slaybaugh looked out a window and noticed two police cars parked outside her neighbor's home.  Curious as to what was happening, she went and opened her front door.  Standing on the doorstep were two police officers, one with a gun drawn and the other holding a flashlight.  The officers told Mrs. Slaybaugh that her son was wanted for questioning regarding a homicide investigation, and they asked her to step outside.  In fact, Conn was suspected of killing Puckett, a Robertson County Sheriff's Deputy, who was his ex-girlfriend.[1]  According to the Slaybaughs, this was when they first learned that their son was in trouble with the law.

After speaking with the officers, Mrs. Slaybaugh asked to go back inside.  She said she would persuade her son to exit, but the officers refused to allow her back in her home.  Finally, after several hours of waiting for Conn to emerge, the police left the residence, and Mrs. Slaybaugh decided to spend the night at her daughter's house.  Mr. Slaybaugh remained at a different property throughout this time.

---

[1]Conn later pleaded guilty to three charges related to Puckett's death, including first-degree murder and aggravated arson.  *See* Tyler Graves, *Smyrna Man Charged in Murder of Robertson County Deputy Faces Life in Prison After Guilty Plea*, Murfreesboro Post (Aug. 15, 2023), https://mainstreetmediatn.com/articles /murfreesboropost/killer-of-robertson-county-deputy-faces-life-in-prison-after-guilty-plea/.

The next morning, Mrs. Slaybaugh returned to her home, which was now surrounded by a perimeter of police.  The officers had obtained an arrest warrant for Conn and a search warrant for the Slaybaughs' residence.  Mrs. Slaybaugh again asked to speak with her son, but police again told her that she was not permitted to enter the home.

More hours passed, and Conn still had not come outside.  At that point, officers tried to smoke him out: they fired approximately 35 tear gas cannisters into the dwelling.  They entered the home and arrested Conn shortly thereafter.  No one suffered any serious physical injury.  But according to the Complaint, the barrage of the house caused "extensive damage to both the internal and external structure of [their] home and the contents inside."  Compl., R. 1, PageID 4.  Because of the officers' actions, "cannisters of tear gas were lodged into the drywall, flooring was burnt, and nearly-new furniture was destroyed."  *Id.*  According to the Slaybaughs, they have suffered approximately $70,000 in damages so far, and repairs are not complete.

Adding to their misery, the Slaybaughs' home insurer denied coverage for the damage because it was "caused by a civil authority."  Ins. Letter, R. 1-3, PageID 50.  But the civil authority would not pay either: the Slaybaughs requested compensation from the Town and County, both of which refused.  Having run out of options, the Slaybaughs then filed this action in January 2023, asserting claims under 42 U.S.C. § 1983 and the Tennessee Constitution.  They allege that the police officers effected a taking under the Fifth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment, and under the Tennessee Constitution, when the officers severely damaged their home in the course of arresting Conn.

Defendants filed a motion to dismiss the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which the district court granted.  The court dismissed the federal constitutional claim, reasoning the police actions did not amount to a taking for public use because law enforcement damaged the Slaybaughs' residence while enforcing Tennessee's criminal laws.  The court dismissed the state-law claim for the same reason, explaining that the Tennessee Supreme Court has held that the state constitution "offer[s] protections co-extensive with those of the Takings Clause in the Fifth Amendment."  *Slaybaugh v. Rutherford Cnty.*, 688 F. Supp. 3d 692, 708 (M.D. Tenn. 2023).  The Slaybaughs timely appealed.

## II.

### A. Fifth Amendment Claim

The Slaybaughs first contend that they are entitled to compensation under the Fifth Amendment's Takings Clause, which applies to state and local governments through the Fourteenth Amendment. *Chi., B & Q.R. Co. v. City of Chi.*, 166 U.S. 226, 239 (1897) (incorporating Fifth Amendment Takings Clause against the states). The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. We look to history and precedent to determine whether the Slaybaughs have alleged that the government has "taken" their "property" within the meaning of this text. *Id.*; *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 637–44 (2023); *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015); *Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 67 F.4th 816, 829 (6th Cir. 2023) (accepting property owners' view of the Takings Clause because "[n]othing in the text or original understanding" justified the government's position, and because "the Supreme Court's . . . takings precedent" conflicted with the government's arguments); *F.P. Dev., LLC v. Charter Twp. of Canton*, 16 F.4th 198, 204–05 (6th Cir. 2021) (considering the history of land-use regulations in the Founding era to determine whether an ordinance violates the Takings Clause).

The Slaybaughs contend that they have "easily met" the requirements for stating a claim under the Takings Clause because they alleged that police "(1) intentionally or foreseeably (2) caused property damage [to their home] (3) for the public use." Appellant Br. at 14–15; *see also Knick v. Twp. of Scott*, 588 U.S. 180, 209 (2019) (Kagan, J., dissenting) (listing the "two necessary elements" of a takings claim: "First, the government must take the property. Second, it must deny the property owner just compensation."). Having established that the damage to their property is covered by the Fifth Amendment's plain text, they argue that, to avoid liability, the government must demonstrate the applicability of an exception to the just compensation requirement—a burden that they claim the government failed to meet. Appellant Br. at 19–22 (citing *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022)).

But Defendants maintain that when "law enforcement . . . execut[es] . . . a warrant to apprehend a dangerous fugitive," there can be no taking.  County Br. at 21 n.7.  That is, when police acted lawfully in carrying out Conn's arrest, Defendants argue, their conduct (and any resulting damage to the Slaybaughs' home) is excluded from takings liability.

The district court held that the Slaybaughs' claim was barred under a categorical rule that, when the government acts pursuant to its "police powers," its actions are always exempt from the Fifth Amendment's just compensation requirement.  *Slaybaugh*, 688 F. Supp. 3d at 703–07 (citing *Lech v. Jackson*, 791 F. App'x 711 (10th Cir. 2019), *cert. denied*, 141 S. Ct. 160 (2020)); *see also Zitter v. Petruccelli*, 744 F. App'x 90, 96 (3d Cir. 2018) (noting that state action taken pursuant to police powers bars takings liability); *Johnson v. Manitowoc Cnty.*, 635 F.3d 331, 336 (7th Cir. 2011) (same); *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008) (same).

We decline to apply the categorical "police power" exception adopted by the district court for two reasons.  First, it is questionable whether such an approach comports with the text and history of the Takings Clause or with precedent interpreting it.  *Baker v. City of McKinney*, 84 F.4th 378, 384 (5th Cir. 2023) (explaining that *Lech*, *Johnson*, and *AmeriSource* "do not rely on history, tradition, or historical precedent").  Second, a categorical exception would run afoul of Supreme Court precedent recognizing that the government's exercise of its police powers can, in some circumstances, amount to a taking.  *See, e.g.*, *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."); *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (explaining that "[t]he essential question is not . . . whether the government action at issue comes garbed as a regulation . . . [but] whether the government has physically taken property for itself or someone else—by whatever means").

Nevertheless, we hold that the Slaybaughs have not stated a takings claim based on the facts alleged.  Their Complaint demonstrates that the officers' actions while arresting Conn were privileged, so police did not infringe on the Slaybaughs' legally cognizable property interests.

In arguing their prima facie takings claim, the Slaybaughs contend that police infringed on their property rights by invading and damaging their home to arrest Conn.  Appellant Br. at 14–15.  They are correct in a general sense—their home constitutes real "property," and the Slaybaughs undoubtedly possess a "bundle of rights" with respect to that property by virtue of their obtaining title to it.  *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'" (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945))); *Cedar Point Nursery*, 594 U.S. at 149–50 ("According to Blackstone, the very idea of property entails 'that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe.'" (quoting 2 W. Blackstone, *Commentaries on the Laws of England* 2 (1766))).

But a property owner's rights in his home are not absolute.  Indeed, the Supreme Court has explained that "the range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments" may be limited by "'existing rules or understandings that stem from an independent source such as state law.'"  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  True, the Slaybaughs possess a right to exclude unwanted visitors from their home—"one of the most treasured" rights of property ownership.  *Loretto*, 458 U.S. at 435.  But that does not mean that they could exclude *anyone* from their home, in *any* circumstance.  Rather, their right to exclude is limited by "relevant background principles" placed upon home ownership.  *Lucas*, 505 U.S. at 1030.

The Supreme Court in *Cedar Point Nursery* explained that common law tort privileges are one such "independent source" that help to define what counts as a "taking" of "property" under the Fifth Amendment.  *See* 594 U.S. at 160.  There, the Court explained that "many government-authorized physical invasions will not amount to takings" because "the government does not take a property interest when it merely asserts a 'pre-existing limitation upon the land owner's title.'"  *Id.* (quoting *Lucas*, 505 U.S. at 1028–29).  The Court listed several "traditional common law privileges to access private property" as examples:

> One such privilege allowed individuals to enter property in the event of public or private necessity. *See* Restatement (Second) of Torts § 196 (1964) (entry to avert an imminent public disaster); § 197 (entry to avert serious harm to a person, land, or chattels) . . . . The common law also recognized a privilege to enter property to effect an arrest or enforce the criminal law under certain circumstances. Restatement (Second) of Torts §§ 204–205. Because a property owner traditionally had no right to exclude an official engaged in a reasonable search, . . . government searches that are consistent with the Fourth Amendment and state law cannot be said to take any property right from landowners.

*Id.* at 160–61 (internal citations omitted). We hold that one of those privileges—the privilege to carry out a lawful search or arrest (the search-and-arrest privilege)—applies to law enforcement's conduct here. If the Slaybaughs had no right to exclude law enforcement's privileged actions in the first place, police cannot be said to have "taken" any of their legally cognizable property interests. Thus, if the officers' actions were covered by that privilege, the Slaybaughs cannot recover for any damage to their home resulting from officers' lawful conduct. As will be explained below, the search-and-arrest privilege covers police use of force when carrying out a lawful arrest, is deeply rooted in the common law and our nation's history, is consistent with our concept of reasonableness under the Fourth Amendment, and, as applied here, exempts law enforcement from liability for damage to the Slaybaughs' home.

1. **The Search-And-Arrest Privilege Can Exempt Certain Police Damage to Property from Takings Liability**

According to generally accepted principles of modern tort law, the authority to arrest "carries with it the privilege to enter land in the possession of another for the purpose of making such an arrest, if the person sought to be arrested is on the land or if the actor reasonably believes him to be there." Restatement (Second) of Torts § 204. The police privilege to enter property to effect an arrest includes the privilege to break into that property. *See id.* § 204 cmt. b ("The privilege stated in this Section carries with it the privilege to . . . peaceably . . . enter a dwelling or to break and enter a fence or other enclosure or a building other than a dwelling, if necessary."). And this "privilege[] to enter land . . . carr[ies] with [it] the privilege to use force to enter a dwelling if the person sought to be taken into custody is in the dwelling." *Id.* § 206(1); *see id.* § 213(1)(h) ("One who is privileged to enter land is further privileged to break and enter . . . a dwelling or other building, if it is reasonably necessary . . . to accomplish the purpose

of the privilege, where he is acting . . . under the circumstances stated in § 206 . . . to make an arrest.").

Importantly, for an officer's conduct to fall within the scope of the privilege, his entry and any accompanying force must be reasonable. The *Cedar Point* Court clarified that only police "searches that are consistent with the Fourth Amendment and state law" are privileged, such that they "cannot be said to take any property right from landowners." 594 U.S. at 161. And an officer must provide an "explanation and demand for admittance" before using force to enter a home and make an arrest, "unless the actor reasonably believes such demand to be impractical or useless." Restatement (Second) of Torts § 206(1). In sum, under the search-and-arrest privilege, law enforcement may forcibly enter a home to arrest someone, so long as (1) the arrest is lawful and (2) the use of force in carrying out the arrest is reasonable.

*History.* This 21st-century understanding of the search-and-arrest privilege is consistent with its history. In early common law, a police officer generally could not break into a home to carry out an arrest or conduct a search unless he had a lawful warrant. Thomas Y. Davies, *Correcting Search-and-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of "Due Process of Law,"* 77 Miss. L.J. 1, 63–64 (2007); *see also id.* at 77 ("[Sergeant William] Hawkins and [Richard] Burn reiterated the need for a warrant 'to break [a] man's house' (that is, to enter through a closed door)." (internal citation and quotation marks omitted)). Sir Edward Coke tied the warrant requirement to "Magna Carta 29's command that no freeman be 'taken' or 'imprisoned' except by 'the law of the land' or 'due processe of law.'" *Id.* at 67 (quoting Sir Edward Coke, *The Second Part of the Institutes of the Lawes of England* 45–46 (1642)).

But, with a warrant, English law permitted police to use force to enter homes, conduct searches, and carry out arrests. *See id.* at 77. Seventeenth-century writer William Sheppard stated that constables could "make diligent search for" a suspected felon "in all such places . . . as they shall understand to be likely to finde him in"; and that if the owner of the house where a felon was suspected to be hiding would not "upon request . . . open his dores," the constables "may break open the dores upon him to come in to search." Laura K. Donohue, *The Original*

*Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1230 (2016) (quoting William Sheppard, *The Offices of Constables*, ch 8 § 2 no.10 (Ric. Hondgkinsonne 2d ed. 1675)).

Sometimes, though, a constable could be liable for broken doors. Failure to comply with the warrant requirement could, in some cases, subject law enforcement to liability for resulting damage to property from an unlawful search or arrest. In such circumstances, an injured property owner could recover for trespass. *See, e.g.*, *Entick v. Carrington*, 95 Eng. Rep. 807, 818 (K.B. 1765) (holding that police committed trespass where they executed a search for papers without a valid warrant); *Bostock v. Saunders*, 95 Eng. Rep. 1141, 1143 (K.B. 1773) (explaining that the plaintiff could recover for trespass where police searched home with warrant supported by false information); *see also* Donohue, *supra*, at 1189–90 ("In the absence of a warrant, the actions of the government official amounted to a trespass."). The same was sometimes true if the officers failed to knock and announce their presence to give the occupants a chance to open their doors voluntarily without property damage. *See Wilson v. Arkansas*, 514 U.S. 927, 931–36 (1995).

By contrast, English courts repeatedly recognized that officers were not liable for certain property damage resulting from their lawful entries. *See, e.g.*, *Semayne's Case*, 77 Eng. Rep. 194, 195, 197 n.G (K.B. 1603) (holding that officers who lawfully entered a house "may break open any inner doors or trunks for executing the writ"); *The Case of Richard Curtis*, 168 Eng. Rep. 67, 68 (K.B. 1757) (holding that officers with a "legal warrant to arrest for a breach of the peace, may break open doors, after having demanded admittance and given due notice of their warrant"); *Entick*, 95 Eng. Rep. at 813 (officer executing a lawful search to recover stolen property "may break open doors, boxes, [etc.] to come at such stolen goods"); *Launock v. Brown*, 106 Eng. Rep. 482, 482 (K.B. 1819) ("In the execution of criminal process against any man in the case of a misdemeanor, it is necessary to demand admittance, before the breaking of the outer door can be legally justified.").

The Founders incorporated similar principles into the Fourth Amendment, although they imposed stricter requirements for warrants than their English counterparts. *See* Donohue, *supra*, at 1192–93, 1305 (explaining that purpose of the Fourth Amendment was to "protect individuals against general warrants," defined as warrants that "failed to specify the person, crime, or place

to be searched"). As in England, the colonies recognized that lawful police entries onto property were privileged. Indeed, the Framers imputed English standards directly into the Fourth Amendment's text by prohibiting searches or seizures that are "unreasonable"—which, as they understood the term, meant going "against the reason of the common law." *Id.* at 1192, 1272 (explaining that Founding-era "[l]egal tracts . . . made a similar link between unreasonableness (as against the reason of the common law) and illegality").

*Precedent.* Most relevant here, early state and federal court decisions (like prior English decisions) held that a police officer who used force to carry out a search or arrest was not liable for any damage resulting from his lawful actions. *See, e.g.*, *Kelsy v. Wright*, 1 Root 83, 84 (Conn. 1783) (holding that a constable with a valid warrant to arrest Wright, "after making known his business and demanding admittance, and being refused by [Wright's] wife," "had right to break open the door and enter [Wright's] house"); *Bell v. Clapp*, 10 Johns. 263, 265–66 (N.Y. 1813) (per curiam) (holding that an officer with a valid search warrant to recover stolen goods could "break[] open the door" to search for the goods and explaining that "search warrants are often indispensable to the detection of crimes; and they would be of little or no efficacy without this power attached to them"); *Jacobs v. Measures*, 13 Gray 74, 75 (Mass. 1859) (holding that an officer, "in the execution of valid criminal process," may "break[] the outer door of a dwelling-house, after demanding admittance and being refused"). But if an officer's entry was not justified, he could be held liable for trespass. In both England and America, the proper recourse for parties who suffered property damage from police conduct was to challenge the legality of that conduct, not allege a taking even if the action was otherwise lawful. *See* Akhil R. Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 774 (1994) (explaining that in the "early years of the Republic . . . . any official who searched or seized could be sued by the citizen target in an ordinary trespass suit").

Courts applying the privilege more recently have reached the same conclusions. For example, state courts routinely hold that where police act unlawfully, injured parties can recover for any resulting property damage in an action for trespass. *See, e.g.*, *Brutsche v. City of Kent*, 193 P.3d 110, 118 (Wash. 2008) (recognizing that city could be liable in trespass for police damage to property when police acted unreasonably while conducting the search); *Onderdonk v.*

*State*, 648 N.Y.S.2d 214, 219 (N.Y. Ct. Cl. 1996) (holding that the plaintiff is entitled to recovery on her trespass claim where police damaged property in the course of an unreasonably conducted search); *Richardson v. Henderson*, 651 So.2d 501, 504–06 (La. Ct. App. 1995) (awarding plaintiffs compensatory damages in trespass action where officers acted unreasonably while carrying out a search warrant).

And, while not explicitly referencing the search-and-arrest privilege, federal courts apply the privilege when discussing reasonable searches and seizures under the Fourth Amendment. *See Wilson*, 514 U.S. at 931–36. Our circuit has repeatedly recognized that property damage resulting from an unlawful search or seizure counts as a Fourth Amendment "injury" that may be compensated. *See, e.g.*, *Gardner v. Evans*, 920 F.3d 1038, 1049–51 (6th Cir. 2019); *Smith v. City of Detroit*, 751 F. App'x 691, 696–97 (6th Cir. 2018); *Spangler v. Wenninger*, 388 F. App'x 507, 511–12 (6th Cir. 2010); *Livingston v. Luken*, 151 F. App'x 470, 475–76 (6th Cir. 2005). *See generally Heck v. Humphrey*, 512 U.S. 477, 487 n.7 (1994) (clarifying that a plaintiff seeking damages for a Fourth Amendment violation under 42 U.S.C. § 1983 "must prove not only that the search [or seizure] was unlawful, but that it caused him actual, compensable injury" (internal citations omitted)). However, where police comply with the Fourth Amendment, we have held that no compensation is owed. *See, e.g.*, *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 575–76 (6th Cir. 2016); *Meeks v. Larsen*, 611 F. App'x 277, 285 (6th Cir. 2015).[2]

This is the case even where a homeowner suffers extensive property damage because of officers' lawful conduct. As we have recognized, "officers executing search warrants on occasion must damage property in order to perform their duty." *Battle Creek Police Dep't*, 844 F.3d at 575 (quoting *Dalia v. United States*, 441 U.S. 238, 258 (1979)); *see United States v. Whisnant*, 391 F. App'x. 426, 430 (6th Cir. 2010) (finding that officers acted reasonably in

---

[2]The Fourth Amendment requires that a search or seizure be both lawfully supported (such as by a warrant) and reasonably executed. As such, a person whose property was damaged during a warrant-authorized search may nonetheless recover if police carried out the warrant in an unreasonable manner. For example, although we held in *Gardner* that valid warrants justified a search for contraband, the plaintiffs created a genuine dispute of fact as to whether "the [officers'] level of destruction" in executing those warrants was "necessary [or] reasonable." 920 F.3d at 1050–51; *see also Bonds v. Cox*, 20 F.3d 697, 702–03 (6th Cir. 1994) (finding officers "'seized' [] property within the meaning of the Fourth Amendment when they conducted their search" and remanding for determination as to whether the search's execution was reasonable). But in either context, a remedy is available not under the Fifth Amendment, but rather for common law trespass and under the Fourth Amendment.

cutting a hole in the interior wall of defendant's house); *United States v. Dawkins*, 83 F. App'x 48, 51 (6th Cir. 2003) (holding that the use of a flash-bang while executing a search warrant was objectively reasonable, "[a]lthough Mr. Dawkins suffered some property damage from the device's use (the shattered penny jar, a dented file cabinet, and burn marks on the floor)"); *see also Pena v. Marcus*, 715 F. App'x 981, 986–87 (11th Cir. 2017) (finding SWAT team's damage to plaintiff's doors and walls while executing search warrant was reasonable).

The Slaybaughs provide several reasons why applying the search-and-arrest privilege does not resolve this case. They first argue that *Cedar Point*'s discussion of privileges is not controlling because that case involved "the mere entry upon" property; while here, officers intentionally destroyed their home. Appellant Br. at 23. But the Restatement, history, and precedent demonstrate that the privilege to enter includes a privilege to use force to enter. What's more, the *Cedar Point* Court explained that its discussion of "longstanding background restrictions on property rights" referred to potential takings, and not to trespasses, which the Court defined as "[i]solated physical invasions, not undertaken pursuant to a granted right of access." 594 U.S. at 159–60. By excluding isolated entries onto property from the realm of takings, the Court recognized that common law privileges could apply only to conduct that could be considered a taking, such as repeated violations of a landowner's property rights. *Id.* Thus, even if *Cedar Point* itself involved only the entry onto property, the Court understood that a more severe incursion could be privileged at common law.

The Slaybaughs also argue that another of *Cedar Point*'s "longstanding background restrictions"—a privilege for actions taken "in the event of public or private necessity" (the necessity privilege)—should not prevent them from recovering. 594 U.S. at 160–61 (citing Restatement (Second) of Torts §§ 196–97). In a case involving nearly identical facts, the Fifth Circuit applied a necessity privilege to hold that when responding to an emergency, police may not be held liable for resulting damage to property under the Fifth Amendment. *Baker*, 84 F.4th at 385. The Slaybaughs contend that the Fifth Circuit's decision was erroneous because (1) the necessity privilege is a defense to tort liability, not to a Fifth Amendment claim, and (2) history and precedent support finding that even if officers acted out of necessity, they could recover for damage to their property under the Fifth Amendment. Appellant Br. at 37–45. To their first

argument, as just explained, we apply common law privileges to determine whether a search or seizure is reasonable under the Fourth Amendment. And in *Cedar Point*, the Supreme Court applied those same privileges to the takings context to determine if the state infringed on a legally cognizable property interest. 594 U.S. at 160–61; *see also Lucas*, 505 U.S. at 1028–29. So, we may consider tort-law privileges when determining whether the Slaybaughs' property was taken.

To their second point, the Slaybaughs cite Founding-era statutes and state constitutions recognizing that even where actions are justified by necessity at common law, property owners are entitled to compensation. *See, e.g.*, Northwest Ordinance of 1787, art. II (requiring compensation when, in the case of a "public exigenc[y]," property was taken "for the common preservation"); Vt. Const., ch. 1, art. II (1777) ("[P]rivate property ought to be subservient to public uses, when necessity requires it; nevertheless, whenever any particular man's property is taken for the use of the public, the owner ought to receive an equivalent in money."). They also point to evidence suggesting that, by proposing the Fifth Amendment, James Madison sought to compensate those whose property was taken by the government for use during the Revolutionary War—conduct that was privileged at common law. *See* Appellant Br. at 42 (citing St. George Tucker, 1 *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* 305–06 (1803) (noting that the Takings Clause "was probably intended to restrain the arbitrary and oppressive mode of obtaining supplies for the army, and other public uses, by impressment, as was too frequently practised during the revolutionary war")).

We acknowledge that some historical evidence suggests that, in certain circumstances, persons could be compensated for the taking of property out of necessity. *See United States v. Russell*, 80 U.S. 623, 629 (1871) (holding that property owners may receive "full restitution" for property seized during wartime); *Mitchell v. Harmony*, 54 U.S. 115, 134 (1851) (holding that army officer who seized plaintiff's workmen and chattels for use during the war was "not a trespasser," but that "the government is bound to make full compensation to the owner"). However, that evidence is not conclusive—even the Slaybaughs acknowledge that the Supreme Court has held that no compensation is owed in other contexts where the necessity privilege

would apply, such as when property is destroyed as an inevitable consequence of conflict, or when the property would have benefitted an enemy in battle. Appellant Br. at 15–16. *See, e.g.*, *Nat'l Bd. of YMCAs v. United States*, 395 U.S. 85, 90–92 (1969) (holding that no compensation is required for damage to property during a riot where troops "act[ed] primarily in defense of [the owners'] buildings" and rioters would have inflicted damage on the building anyway); *United States v. Caltex*, 344 U.S. 149, 155 (1952) (finding no takings claim where army destroyed oil facilities that were a "potential weapon of great significance to the invader"); *United States v. Pacific R.R.*, 120 U.S. 227, 234–35 (1887) (holding that property damaged "through necessity and by mere accident," including "damages caused by the enemy" during battle, are not compensable).

Nonetheless, we need not resolve this "necessity" defense to an actual taking. We reject the Slaybaughs' claim not because of that defense, but because they have failed to identify any history or precedent establishing that the police have "taken" their "property" within the meaning of the Fifth Amendment when the police damaged the property while conducting a lawful arrest. *See Baker*, 84 F.4th at 385 (rejecting takings claim where the plaintiffs did not provide "historical or contemporary authority that involves facts closer to those at bar and where the petitioner succeeded under the Takings Clause"); *cf. Culley v. Marshall*, 601 U.S. 377, 392 (2024) (holding that lack of historical evidence showing that a preliminary hearing is required in civil forfeiture cases supports holding that no such hearing is required under the Due Process Clause).

\*      \*      \*

The Supreme Court instructs us to look to common law privileges on property rights to determine whether a claimant has alleged that his property was taken for public use under the Fifth Amendment. One such privilege—the search-and-arrest privilege—provides that police are not liable for damage to property that occurs when they carry out a lawful search or arrest. That privilege is rooted in the common law, has been long recognized in our court system as a defense to trespass claims, and maps neatly onto our caselaw holding that persons who suffered an unreasonable search or seizure may be entitled to damages under the Fourth Amendment. Moreover, because we hold that the search-and-arrest privilege controls here, we need not

conclusively decide whether another privilege, such as the necessity privilege, could also exempt law enforcement from takings liability.  We only hold that in cases where police damage property while carrying out a lawful search or arrest, property owners are not entitled to compensation under the Takings Clause for that damage as long as the officers' conduct is reasonable.

### 2.  The Search-And-Arrest Privilege Applies Here

Having found that the search-and-arrest privilege *can* exempt law enforcement from takings liability, we next consider whether it exempts the police conduct at issue here.  Based on the facts in the Slaybaughs' Complaint, we conclude that it does.  The Slaybaughs did not allege any facts suggesting that the search and arrest warrants justifying the officers' actions were unlawful, or that police unreasonably executed those warrants when arresting Conn.  To the contrary: they concede on appeal that they do not "mean to suggest that what the police did was *unlawful*."  Appellant Br. at 48.  By failing to plead facts suggesting that the search of their house was unlawful, they do not come close to establishing that police exceeded the scope of the search-and-arrest privilege.[3]  And because police acted within that privilege when they damaged the house, the Slaybaughs are not entitled to compensation for that damage under the Fifth Amendment.

### B.  Tennessee Constitutional Claim

The Slaybaughs next claim that they are entitled to compensation under the Tennessee Constitution.  Article I, Section 21 of the Tennessee Constitution provides that "no man's particular services shall be demanded, or property taken, or applied to public use, without the

---

[3]The Slaybaughs argue that it was not their burden to establish that law enforcement's conduct was not privileged, or that application of the privilege does not preclude recovery under the Takings Clause.  Rather, because they alleged a taking under the plain text of the Fifth Amendment, they maintain, the "burden shift[ed] to the government to demonstrate an applicable exception to the Fifth Amendment's categorical command."  Appellant Br. at 19–20 (citing *Bruen*, 597 U.S. at 17).  Even if we were to apply *Bruen*'s two-step framework to our Takings Clause analysis, the Slaybaughs' claim fails under the first step because they did not establish that their "property" was "taken."  Police did not infringe on any cognizable property interest when they arrested Conn because the Slaybaughs' property rights in their home did not include a right to exclude law enforcement from carrying out a lawful arrest.  *See Cedar Point*, 594 U.S. at 160.  Because they did not establish a prima facie Takings Claim, their argument that the government bears the burden of establishing a "historic exception" to the Takings Clause falls short.

consent of his representatives, or without just compensation being made therefor." The district court dismissed their claim, explaining that the Tennessee Supreme Court "has construed article 1, section 21 of the Tennessee Constitution as offering protections co-extensive with those of the Takings Clause in the Fifth Amendment." *Slaybaugh*, 688 F. Supp. 3d at 708 (citing *Phillips v. Montgomery Cnty.*, 442 S.W.3d 233, 244 (Tenn. 2014)). Because the court determined that the Slaybaughs were not entitled to compensation under the Fifth Amendment, it rejected Plaintiffs' state constitutional claim on the same grounds.

We agree with the district court. In a case involving a regulatory taking, the Tennessee Supreme Court recognized that the state's Takings Clause is not "less protective of private property rights" than the Fifth Amendment. *Phillips*, 442 S.W.3d at 244. But that holding, which recognized that regulatory takings under the state constitution should be treated consistently with Fifth Amendment claims, does not establish that the Slaybaughs are entitled to greater property protections here. Their state-law claim was properly dismissed.

## III.

We **AFFIRM** the judgment of the district court.