RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0021p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────────

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

    *v.*

STEVEN TILDEN FELLMY,

                *Defendant-Appellant.*

No. 25-5381

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:24-cr-00006-1—Karen K. Caldwell, District Judge.

Decided and Filed: January 23, 2026

Before: GRIFFIN, THAPAR, and HERMANDORFER, Circuit Judges.

───────────────────

**COUNSEL**

**ON BRIEF:** Jeffrey C. Rager, RAGER LAW FIRM, PLLC, Lexington, Kentucky, for Appellant. Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

      The court delivered a PER CURIAM opinion. THAPAR, (pp. 12–26) and HERMANDORFER (pp. 27–34), delivered separate concurring opinions.

———————————

**OPINION**

———————————

PER CURIAM.   Following an anonymous tip, police found a large quantity of methamphetamine in Steven Fellmy's car.  Fellmy contends that the drugs should have been suppressed at trial because the officers unlawfully searched his car using a police dog. We affirm.

I.

Deputy Michael Raisor received a tip that a man named Steven Fellmy was transporting drugs through Mercer County, Kentucky, in a silver Ford Mustang with a black racing stripe. After he saw a car matching that description, Raisor pulled behind the Mustang and observed that its license plate wasn't illuminated.  He also saw the Mustang make a right turn without signaling.  So Raisor pulled the car over.  He first verified that Fellmy's license-plate number matched the police department's records and that his name matched the anonymous tip.  Then Raisor waited for backup to arrive.

After other officers reported to the scene, Raisor directed Fellmy to step out of the Mustang.  Raisor then asked Fellmy if the officers could search his vehicle.  Fellmy said no.  So Corporal Isaac Shelton, a K-9 officer, conducted a dog sniff for the presence of drugs.  Shelton walked a drug dog named Tyra around the vehicle on a leash so she could sniff various parts of the car.  When he reached the open driver-side window, Shelton tapped the windowsill.  In response, Tyra jumped up onto the door of Fellmy's car and sniffed for drugs.  When she didn't alert, the officer walked Tyra around to the passenger side and tapped on the windowsill.  Tyra once again jumped up onto the car door with her two front paws resting on the windowsill and stuck her nose partially through the open window.  This time, she alerted to the presence of drugs.

Officers then searched Fellmy's car and found a bag containing a large crystal of methamphetamine. They also searched Fellmy's person and found heroin along with more methamphetamine. So Fellmy was arrested and charged with possession of methamphetamine with intent to distribute.

Before trial, Fellmy moved to suppress the drugs. He argued that the officers (1) unlawfully seized him by ordering him to exit his vehicle and (2) unlawfully searched him by directing the drug dog to jump onto the car door to sniff inside it. But the district court denied his motion to suppress. It found that police officers have an "unequivocal right" to order a driver out of his car after a traffic stop for safety reasons. R. 24, Pg. ID 64–65. So no unlawful seizure occurred. The district court also held that the officers hadn't unlawfully searched Fellmy's car because they didn't "encourage or facilitate" Tyra to put her head into the vehicle. *Id.* at 66.

Fellmy later filed a motion in limine to exclude the bag of methamphetamine from trial. He argued that the drugs were not properly authenticated under Federal Rule of Evidence 901 because police records showed significant differences in drug weight and because the government had not maintained an adequate chain of custody. And Fellmy asked for an evidentiary hearing to present evidence supporting this claim. The district court again denied Fellmy's motion. It observed that a motion to suppress would have been a more appropriate way to raise the argument and that Fellmy could adequately dispute the evidence's authenticity via cross-examination. Accordingly, the court admitted the drugs.

A jury then convicted Fellmy of trafficking methamphetamine, and the district court sentenced him to 300 months in prison to be followed by ten years of supervised release. Fellmy timely appealed his conviction. He contends the district court erred by admitting the drugs.

II.

Fellmy first argues that the drugs should be suppressed because the officers found the drugs following both a search and a seizure that violated the Fourth Amendment. The Fourth Amendment protects "the right of the people" to be "secure in their persons . . . and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To determine whether the

officers violated the Fourth Amendment, we ask two questions. Did they commit a search or a seizure? And if so, was that search or seizure unreasonable?

On appeal of a motion to suppress, we review a district court's factual findings for clear error and its legal conclusions de novo. *United States v. Quinney*, 583 F.3d 891, 893 (6th Cir. 2009).

A.

Start with Fellmy's seizure argument. Fellmy contends that the drug evidence should have been suppressed because the officers unconstitutionally seized him when they ordered him to step out of his vehicle during the traffic stop. And Fellmy believes that seizure was unreasonable because officers asked him to exit the vehicle only as pretext to perform a dog sniff. Appellant Br. at 18.

But officers may always order drivers out of their car during a lawful police stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977). Why? Because officers must be able to "exercise unquestioned command of the situation" to minimize danger for both the officers and the driver. *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)). The officers' subjective motivation doesn't matter. *Cf. Whren v. United States*, 517 U.S. 806, 813 (1996). And Fellmy admits that he had failed to signal at a right turn, and thereby committed a traffic violation. When police see a traffic violation, they can lawfully stop the driver. *See id*. at 819. That means Officer Raisor had conducted a lawful police stop. So the officers didn't unlawfully seize Fellmy when they asked him to exit his car.

B.

Fellmy next contends that Tyra's dog sniff—which led to the discovery of the drugs after she alerted—amounted to an unconstitutional search.

The Supreme Court has identified two ways to define a Fourth Amendment search. One test asks whether officials intruded on an individual's "reasonable expectation of privacy." *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). And more recently, the Supreme Court explained that

officials also commit a search by "physically intruding on" constitutionally protected property in "an attempt to find something or to obtain information." *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (citation omitted); *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012). *Jones* made clear that *Katz*'s "reasonable-expectation-of-privacy test" was "*added to,* not *substituted for*" this property-based test, which follows the common-law understanding of trespass. 565 U.S. at 409 (emphasis in original). Fellmy contends that the officers' actions were a search under both *Katz* and *Jones*. He's wrong on both counts.

1.

The officers didn't perform a search under *Katz*. Officers don't violate a driver's reasonable expectation of privacy when they walk a trained drug dog around a lawfully stopped car to sniff for drugs. *See United States v. Place*, 462 U.S. 696, 707 (1983). That's because drug dogs alert only when they smell drugs. So everything inside the car—except drugs—remains private. *See id*. As for the drugs themselves, no one has a reasonable expectation of privacy in such illegal contraband. *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). What's more, drivers already retain a diminished expectation of privacy in the interior of their cars. *See California v. Carney*, 471 U.S. 386, 391 (1985). Cars can be quickly moved between different jurisdictions. *Id*. Because that makes it more difficult to get a warrant to search a car, officers have more leeway to investigate cars without violating the Fourth Amendment. *Id.* at 390.

Under *Katz* and progeny, Officer Shelton conducted a permissible dog sniff. Fellmy had been lawfully pulled over on a public road after committing a traffic violation. *See Whren*, 517 U.S. at 819. And Tyra was a trained and certified drug dog. So when Tyra formally "alerted" to the presence of drugs, the officers had not committed a Fourth Amendment search. R. 29, Pg. ID 85; *Caballes*, 543 U.S. at 409.

Fellmy disagrees, hanging his hat on *United States v. Sharp*, 689 F.3d 616 (6th Cir. 2012). In *Sharp*, we held that officers didn't commit a search after their drug dog jumped into a car during a drug sniff. *Id.* at 617. We reasoned that when dogs take "instinctive" actions, like jumping into a car, a Fourth Amendment search doesn't occur unless the officers "encouraged or facilitated" the dog's action. *Id.* at 620. So Fellmy contends that Officer Shelton committed a

search because Shelton "directed" Tyra to jump up on the driver's and passenger's doors and put her head into the cab of the car. Appellant Br. at 22; *see also Sharp*, 689 F.3d at 620.

But this case is a far cry from *Sharp*. For starters, the dog in *Sharp* jumped through an open window and explored the interior of the car. 689 F.3d at 617–18. Here, by contrast, Tyra momentarily poked her nose partially inside an open window. For *Katz* purposes, we doubt that kind of minimal intrusion—through "*sui generis*" means that could "*only* reveal[] the possession of contraband"—violated Fellmy's already diminished expectation of privacy in the interior of his car. *Caballes*, 543 U.S. at 408–09.

In any event, the district court rendered a factual finding that the officers didn't instruct Tyra to put her nose into the car. While officers signaled for her to jump *onto* the door by patting the windowsill, they never patted *inside* the car or provided any other signal for her to explore the car's interior. Instead, the district court concluded that Tyra "instinctive[ly]" leaned her head towards open car windows to sniff. R. 29, Pg. ID 173; R. 24, Pg. ID 66; *see Sharp*, 689 F.3d at 620. Nor did the officers open the car windows to facilitate that sniff—Fellmy had already opened them when he was pulled over, and the officers did "not have an affirmative duty to close the windows in preparation for the dog sniff." *Sharp*, 689 F.3d at 619 (quotation omitted) (distinguishing between the driver opening the point of entry, such as a hatchback or window, and officers themselves opening the point of entry).

Fellmy's objection under *Sharp* thus boils down to a different reading of the factual record about the officers' role in facilitating Tyra's sniffs of the car's interior. "Where there are two permissible views of the evidence, however, the factfinder's choice between them cannot be clearly erroneous." *United States v. Jackson*, 154 F.4th 422, 430 (6th Cir. 2025) (citation omitted). So *Sharp* does not support Fellmy's Fourth Amendment claim.

2.

Fellmy's arguments under *Jones* also fail. As noted, officials commit a search when they "physically occup[y]" or "physically intrud[e]" on private property to find information. *Jones*, 565 U.S. at 404, 408 n.5; *Jardines*, 569 U.S. at 5. Fellmy argues that the officers' actions were a *Jones* search because Tyra, by "standing on her hind legs and sticking her nose into the interior

of the car," committed a common-law "trespass against property, i.e. chattel" under Kentucky law.  Appellant Br. at 20–21.

The officials' actions met *part* of the *Jones* test.  Fellmy's car was constitutionally protected property.  The Fourth Amendment protects "persons, houses, papers, and effects," and Fellmy's car falls within that protection because the Supreme Court has told us that cars are "effect[s]."  U.S. Const. amend. IV; *Jones*, 565 U.S. at 404 (quotation omitted).  And Tyra's presence at the scene—and subsequent alleged trespass—was intended to obtain information.  That's because she was trying to sniff the open car windows to check for drugs.

But Tyra's conduct in performing the free-air sniff around Fellmy's vehicle didn't constitute a search under *Jones*.  That's because Tyra merely made incidental contact with the car while performing the challenged sniffs.  Most of Tyra's body, including her nose, didn't touch Fellmy's car.  Only Tyra's front paws made fleeting contact with the car's windowsills— with most of her weight still resting on the ground.  Nor, moreover, did the fleeting contact between Tyra's front paws and Fellmy's vehicle—which, again, is the only "physical" contact Fellmy cites, *Jones*, 565 U.S. at 405—itself communicate any information.  Similar contact, we previously held in the context of briefly "sliding" a credit-card "through a scanner" like the ones available at gas stations and grocery stores, does "not involve" the kind of "physical intrusion" *Jones* regulates.  *United States v. Bah*, 794 F.3d 617, 623, 630 (6th Cir. 2015) (citation modified).  Other circuits have noted the same in post-*Jones* cases involving police dogs' touching (and indeed entry) of vehicles.  *See United States v. Keller*, 123 F.4th 264, 268–69 (5th Cir. 2024) (collecting cases).

*Taylor v. City of Saginaw*, 922 F.3d 328, 332–33 (6th Cir. 2019), does not change that conclusion.  In that case, this court concluded that city officials committed a trespass—and thus a search—when they chalked the bottom of a car tire to track how long the vehicle had been parked.  *Id.* at 332–33.  According to Fellmy, Tyra made similarly "slight" contact with his car, so that's enough to constitute a search under *Taylor*.  922 F.3d at 333.

But Tyra's brief jump looks nothing like the continuous contact in *Taylor*. There, officers chalked car tires. *Id*. at 330–31. Those marks then remained on the tires—sometimes for "several hours"—so officers could determine how long the cars had been parked. *Taylor v. City of Saginaw*, 11 F.4th 483, 486 (6th Cir. 2021); *see Taylor*, 922 F.3d at 330. In other words, the officers intentionally made a physical alteration of the vehicle that was lasting and integral to the search method at issue. In finding a search, *Taylor* thus relied on *Jones*, which stressed that "the Government's *installation* of a GPS device on a target's vehicle, *and* its use of that device to monitor the vehicle's movements, constitutes a 'search.'" *Jones*, 565 U.S. at 404 (emphases added). That continued occupation in *Jones* was a GPS device attached to the underside of a car for four weeks. *Id.* at 403. So just as in *Taylor*, the officers made contact with a car and then left something behind for a significant period: a GPS tracker. *Id.* There's a world of difference between such lasting contact and the limited and incidental contact of the dog here. Note too that, unlike in *Taylor* or *Jones*, Tyra didn't leave anything behind after she got off Fellmy's car. *Taylor*, 922 F.3d at 332–33; *Jones*, 565 U.S. at 403.

Heeding that difference makes sense because, taken to its logical conclusion, Fellmy's argument leads to absurd results. If the incidental contact of Tyra's paws on Fellmy's door was a search, then the Fourth Amendment—and officers' ability to carry out lawful, open-air sniffs of vehicles—would toggle on and off based on things like the height of the drug dog police use, the size of the car stopped, the particular placement (*e.g.*, glove compartment versus wheel well) of drugs within the car, and whether car doors or windows happen to be left open during the sniff. Tyra is "shorter than the average German Shepherd," so she rested her paws on Fellmy's car door to sniff through his open windows. R. 29, Pg. ID 115. But a larger drug dog could sniff through the windows without ever touching Fellmy's car (though perhaps not for a raised truck or SUV). *Cf. Place*, 462 U.S. at 707. So, by Fellmy's logic, that wouldn't be a search. Likewise, if officers had placed a stepstool next to Fellmy's car for Tyra to stand on, that wouldn't be a search either according to Fellmy's view. The same would seem to follow if the officers had lifted Tyra so her nose was at window level. Or if Fellmy had left his door ajar upon exiting the vehicle.

Even worse, apply Fellmy's reasoning to officers themselves. If an officer rests his arm on a car door while he looks through the window for contraband, Fellmy's rule would call that a search.[1] But if the officer simply left his arms at his sides, the very same glance through the window wouldn't be a search. Or what if the officer knocked on a car window to order a defendant to roll it down? If he then saw contraband, would that be a search because the officer had made contact with the window?

Neither logic nor the Fourth Amendment demands such implausible distinctions. To the contrary, injecting such arbitrary factors into the calculus risks hampering law enforcement's ability to efficiently and effectively investigate at traffic-stop scenes, which already are "especially fraught with danger to police officers." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (citation omitted).

For the above reasons, we conclude that the officers didn't violate the Fourth Amendment by virtue of Tyra's brief contact with Fellmy's car during her open-air sniff for drugs.

III.

Fellmy also raises an evidentiary challenge, arguing the court should have excluded the drug evidence based on issues with the chain of custody. Among other concerns, Fellmy believes the evidence was inadmissible because officials recorded different weights for the drugs at different times and because the police officers placed the drugs on a table for a "glamour shot" with Tyra. Appellant Br. at 7–8, 26–27. And Fellmy contends that the district court disregarded these arguments because it incorrectly concluded that his argument should have been made in a motion to suppress, not a motion in limine. Finally, Fellmy claims that the district court erred by denying his request for an evidentiary hearing on the chain-of-custody question.

We review a district court's evidentiary rulings for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997).

---

[1]And that result contradicts both logic and longstanding Supreme Court precedent. *See Texas v. Brown*, 460 U.S. 730, 740 (1983) ("The general public could peer into the interior of [an] automobile from any number of angles; there is no reason [officers] should be precluded from observing . . . that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.").

As a threshold matter, Fellmy is wrong to suggest that the district court didn't engage with his exclusion argument. The district court didn't deny his motion in limine solely based on its determination that he should have raised these arguments in a motion to suppress. While the court "note[d]" that a motion to suppress would have been more appropriate, it still analyzed the merits of Fellmy's arguments. R. 62, Pg. ID 399. Specifically, it concluded that concerns about a break in the chain of custody "go[] to the weight of the evidence." *Id.* And it observed that Fellmy could adequately present his concerns via cross-examination at trial. *Id.*

In any event, the district court didn't abuse its discretion by admitting the methamphetamine. Evidence is admissible as authentic if the proponent produces "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. For physical evidence, that requires showing there is no "reasonable probability" that the evidence has been misidentified or altered. *United States v. Allen*, 106 F.3d 695, 700 (6th Cir. 1997). So a movant seeking exclusion must establish more than a mere "possibility" that the evidence has been tampered with. *Id.* Fellmy hasn't shown that here.

Start with Fellmy's claim that the methamphetamine evidence weighed different amounts at different times before trial. While the recorded weights did vary, the record reflects that the drugs' *packaging* was changed at various stages while weighed in police custody and testing. The district court thus admitted the drug evidence while permitting Fellmy to cross-examine witnesses about those discrepancies. The district court did not abuse its discretion in rejecting Fellmy's request to entirely exclude the evidence based on his arguments about drug "weight" and packaging changing "over time." *United States v. Allen*, 619 F.3d 518, 525 (6th Cir. 2010). Fellmy's arguments pose "jury questions" that "go[] to the weight of the evidence, not its admissibility." *Id.*

That leaves Fellmy's general concerns about breaks in the chain of custody. Fellmy mainly repeats his pretrial contention that the officers improperly left the bag of drugs on a table for a glamour shot with Tyra. But he also raises concerns that surfaced during trial (which he contends would have been considered at his requested evidentiary hearing). Those include the government's failure to provide a list of all the officers who had handled the evidence, Raisor's belief that the chain of custody only began once the drugs were placed in the police department's

evidence room, and Raisor's potentially inconsistent testimony about the bags he used to hold the drugs.  Perhaps those facts show that the department didn't use best practices to store the evidence.  Yet they don't create a "reasonable probability" that someone with access to the evidence tampered with it.  *Allen*, 106 F.3d at 700.  For example, Fellmy provides no allegations about how the drugs were tampered with during the glamour shot.  As the district court said, such vague concerns are for a jury to assess because chain-of-custody issues go to the weight of evidence, not its admissibility.  *See Allen*, 619 F.3d at 525.  So the district court didn't abuse its discretion by admitting the drugs.

Finally, the district court didn't err by refusing Fellmy's request for an evidentiary hearing before trial.  Whether a district court chooses to "hold an evidentiary hearing is within the discretion of the trial court," and the district court properly determined that an evidentiary hearing wasn't needed here.  *United States v. O'Dell*, 805 F.2d 637, 643 (6th Cir. 1986).  Fellmy failed to raise any specific evidence of tampering in his motion to exclude the drugs.  And Fellmy's general concerns about tampering—including the chain-of-custody evidence he adduced at trial—were appropriate for the jury.  After weighing all the evidence, the jury still convicted him.

The district court properly considered and denied Fellmy's motion in limine.

\*       \*       \*

We affirm.

———————————

**CONCURRENCE**

———————————

THAPAR, Circuit Judge, concurring. This is an easy case under *Katz*'s reasonable-expectation-of-privacy test for the reasons stated in the per curiam opinion. But I write separately to discuss the many issues raised by Fellmy's claim that the officers committed a search under *Jones* when Tyra rested her paws on Fellmy's car. That claim complicates this otherwise simple case.

I.

A.

Start with first principles. The Fourth Amendment protects citizens' right to be "secure in their persons . . . and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As relevant here, that prohibition has two key terms: "searches" and "unreasonable." To violate the Fourth Amendment, the officers must have committed a search, and that search must have been unreasonable. And to understand those terms, we look to their meaning at the time of the Founding.

The Supreme Court hasn't always done that. So over time, Fourth Amendment doctrine has grown into a morass of conflicting and indeterminate rules, often relying on amorphous tests like "reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). Those tests have resulted in confusion about both the Amendment's scope and its substance. *See* Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 761–800 (1994).

But more recently, the Court has tried to anchor the Fourth Amendment to its original meaning by turning to the common law. *See United States v. Jones*, 565 U.S. 400, 407, 408 & n.5 (2012). Under *Jones*, officials commit a Fourth Amendment search when their actions

(1) are intended to discover information and (2) violate the common law. *Id.* That approach makes some sense.[1]

First, the ordinary meaning of the word "search" is a purposeful, investigative act. *See Morgan v. Fairfield County*, 903 F.3d 553, 568 (6th Cir. 2018) (Thapar, J., concurring in part and dissenting in part); *Search*, *Webster's Third New International Dictionary of the English Language* (2002); *see also* 2 Noah Webster, *An American Dictionary of the English Language* 66 (1828) (reprint 6th ed. 1989). That fits with the first part of the *Jones* test, which treats an official's act as a "search" only if it was intended to discover information. *See* 565 U.S. at 408 n.5.

Second, the Fourth Amendment's command that searches not be "unreasonable" appears to refer to the common law. After all, "reasonableness" has acted as shorthand for contemporary common law since the Founding. *See, e.g.*, David A. Sklansky, *The Fourth Amendment and Common Law*, 100 Colum. L. Rev. 1739, 1777 (2000) ("The English common-law tradition to which the revolutionaries appealed often tied legality to 'reasonableness.'"); 2 Algernon Sidney, *Discourses Concerning Government* 120 (Philadelphia, C.P. Wayne 1805) (describing common law as "written reason"). That maps onto the second part of the *Jones* test, which asks if an official's acts violated the common law. 565 U.S. at 406–08. Of course, *Jones* collapsed the common-law reasonableness requirement into the very definition of a Fourth Amendment "search," rather than first asking whether a purposeful, investigative act occurred and then analyzing its "reasonableness." *See id.*; U.S. Const. amend. IV; *see also* Amar, *supra*, at 769. But in practice, the *Jones* test focuses on both key terms in the Fourth Amendment—search and reasonableness—by covering actions that violate the common law to discover information.[2]

---

[1]Judge Hermandorfer's thoughtful concurrence makes a good case for why *Jones* shouldn't apply to dog sniffs. That would certainly make life easier for courts and police alike. *See* Hermandorfer Conc. at 29. She further observes that applying *Jones* requires officers to confront "arcane property rules" and "[d]octrinal trouble." *Id.* at 31–32. I agree that these questions aren't easy. But as inferior courts, we must do our best to faithfully apply Supreme Court precedent until the Court tells us otherwise. So I do my best to answer the difficult questions *Jones* poses.

[2]Judge Hermandorfer correctly points out that the Supreme Court has reasoned that dog sniffs aren't searches in certain situations. *See* Hermandorfer Conc. at 27–28. While I agree with the ultimate result that there was no Fourth Amendment violation here, I would approach the question somewhat differently. I believe that when officers direct a dog to sniff a piece of luggage or a car, they are engaged in a "purposeful, investigative act."

B.

Focusing on the common law gets us closer to the Fourth Amendment's original meaning. But it also raises difficult questions. To start, what common law should courts look at to judge reasonableness? There are two possible paths.

One thoughtful scholar has suggested that the Fourth Amendment refers to a federal common law of "reasonableness." *See* Amar, *supra*, at 800–11.[3] Under that method, federal courts would develop a body of "reasonableness" doctrine over time, using common-law-style reasoning to decide what kinds of searches are and are not reasonable. Courts could consider, among other things, the probability that a search will uncover what the government is looking for, the importance of that object, the intrusiveness of the search, and any available alternatives to accomplish the same goal. *See id.* at 801.

Under this approach, the officers' actions here would certainly have been reasonable. The probability that officers would discover drugs in Fellmy's car skyrocketed once Officer Raisor confirmed critical details in the anonymous tip warning that Fellmy would be transporting drugs. Finding illegal drugs—highly mobile and dangerous contraband—is important for society. And the officers' actions were minimally intrusive because they only led Tyra around the outside of the car. Nor are there less invasive alternatives to conducting a dog sniff. After all, drug dogs' "*sui generis*" ability to detect drugs by smell from the exterior makes them less intrusive than any other method of searching a vehicle. *United States v. Place*, 462 U.S. 696, 707 (1983). So if courts applied a federal common law of reasonableness, the officers' actions surely pass muster—no Fourth Amendment violation occurred.

---

*Morgan*, 903 F.3d at 568 (Thapar, J., concurring in part and dissenting in part). But I agree that this search doesn't violate the Fourth Amendment because it qualifies as reasonable. A dog sniff is reasonable in the same way an officer walking up and tapping on a car window is reasonable. Of course, *Jones* tackled this question a little differently by analyzing the common law to determine what counts as a Fourth Amendment search. Yet even if *Jones* applies here, the officer didn't violate the Fourth Amendment, as I discuss below.

[3]Admittedly, Professor Akhil Amar does not specifically refer to the federal common law and primarily considers doctrinal development through state-court actions. Nevertheless, federal courts could easily employ his theory in the Fourth Amendment context.

The second path would tie reasonableness to state common law. Although *Jones* isn't clear on this point, this appears to be the path the Supreme Court chose. Under *Jones*, a search occurs when officers "trespass" onto constitutionally protected property to discover information. 565 U.S. at 407–11, 408 n.5. To determine what qualifies as a trespass, *Jones* directs us to look at the "common-law [of] trespass" to personal property (i.e., chattels). *Id.* at 405; *accord Florida v. Jardines*, 569 U.S. 1, 8 (2013). And the Supreme Court hewed to this understanding in subsequent cases employing the *Jones* test. *See Jardines*, 569 U.S. at 8.

In *Jardines*, the Court applied the law of trespass—including the doctrine of implied license to enter—to consider whether officers committed a search when they conducted a dog sniff on the front porch of a home. *Id.* at 3–4. Admittedly, neither *Jones* nor *Jardines* analyzed specific state-court trespass cases. *See Jones*, 565 U.S. at 404–11; *Jardines*, 569 U.S. at 6–11. But state common law still provides the requirements to make out trespass claims. *See* Restatement (Second) of Torts § 218 (Am. L. Inst. 1965).[4]

Other circuits have followed this state-law approach. For example, in *United States v. Sweeney*, officers discovered a gun in the basement of a home shared by various individuals. 821 F.3d 893, 898 (7th Cir. 2016). The Seventh Circuit considered the Second Restatement of Torts and specific state-court cases to conclude that the officers didn't trespass under *Jones* when they looked through the basement. *Id.* at 900. And in *United States v. Carloss*, the Tenth Circuit examined state-court cases across different states to determine whether a "No Trespassing" sign had revoked the implied license allowing officers to conduct a knock-and-talk—and thus whether officers had committed a *Jones* search. 818 F.3d 988, 995 (10th Cir. 2016). State courts themselves similarly look to state common law when dealing with Fourth Amendment questions. *See, e.g.*, *People v. Kendricks*, 243 N.E.3d 211, 218 (Ill. App. Ct. 2023); *State v. Myers*, ---P. 3d---, No. 51671, 2025 WL 2798583, at *6 (Idaho Ct. App. Oct. 2, 2025). So although *Jones*'s reference to "common law" could be read to reference federal common law,

---

[4]*Jones* also doesn't indicate whether the common law of the state where the alleged violation occurred or an approximation of all state common law controls the meaning of "trespass." 565 U.S. at 407–11, 408 n.5. But it seems like the Supreme Court is looking at general common-law principles of trespass. That would make a lot of sense from a consistency perspective to ensure the Fourth Amendment doesn't change from one state to the next. In this case, however, it doesn't matter because Kentucky's law tracks the general principles of trespass to chattels.

courts have generally operationalized its test by looking to state common law. *Jones*, 565 U.S. at 407.

## C.

But following the common law presents a second important question:  Should we consider *contemporary* or *Founding-era* common law? *See Jones*, 565 U.S. at 419 n.2 (Alito, J., concurring in the judgment).  Based on the original structure and function of the Fourth Amendment, the answer appears to be *current* common law.

To see why, consider the nature of the interests that the Fourth Amendment protects: "property rights." *Id.* at 405 (majority opinion).  The property protections enshrined in the Fourth Amendment developed naturally from colonial-era decisions. *See Entick v. Carrington* (1765) 19 Howell's State Trials 1029 (CP); *Wilkes v. Wood* (1763) 98 Eng. Rep. 489 (KB).  In cases like *Entick* and *Wilkes*, the English courts "transform[ed] trespass from a mere civil tort to a constitutional protection" by applying real restrictions to government searches of homes and effects for the first time.  Laurent Sacharoff, *Constitutional Trespass*, 81 Tenn. L. Rev. 877, 897 (2014) (emphasis omitted).  And each decision emphasized safeguarding citizens' interest in their property. *See Entick*, 19 Howell's State Trials at 1066 ("The great end, for which men entered into society, was to secure their property."); *Wilkes*, 98 Eng. Rep. at 498 (emphasizing that harming the "person and property of every man" may subvert "liberty").  The framers constitutionalized this property-rights focus by specifying that the Fourth Amendment shields "effects" and "houses" from unreasonable searches and seizures.  U.S. Const. amend. IV; *see Boyd v. United States*, 116 U.S. 616, 630 (1886).

And those property rights change over time.  "Property interests . . . are defined by existing rules or understandings. . . ." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  When those rules shift, property rights shift as well. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001–04 (1984) (expanding property rights to cover certain intangible property).  Of course, there are limits to how much these rights can change.  For instance, a state can't define away "traditional property interests long recognized under state law." *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167 (1998) (analyzing the Fifth Amendment's Takings

Clause); *see also Tyler v. Hennepin County*, 598 U.S. 631, 638 (2023) (same).  But as long as state law doesn't attempt to abrogate traditional property interests, courts should look to *existing* law to determine what rights someone holds in his property.

Because current law governs property rights, it also determines how the Fourth Amendment protects those property rights through the common law of trespass.  After all, personal-property ownership includes a bundle of different "sticks," such as the right to exclusively use and dispose of the property.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982) (quotation omitted).  Owners enforce those rights through the tort of trespass to chattels.  *See* Restatement (Second) of Torts § 218.  So when the underlying property right to exclude someone from your property narrows, the tort of trespass to chattels also narrows, and vice versa.  *See Jones*, 565 U.S. at 419 n.2 (Alito, J., concurring in the judgment); *Slaybaugh v. Rutherford County*, 114 F.4th 593, 598 (6th Cir. 2024) (observing that the right to exclude is limited by existing rules and understandings).

This understanding of evolving property rights tracks how we've long thought about the common law.  Common law has always been continually "adapting" to new circumstances and "the exigencies and usages of the country."  Joseph Story, *Codification of the Common Law*, *in The Miscellaneous Writings of Joseph Story* 699, 702 (William W. Story ed., Boston, Little & Brown 1852).  And as Justice Scalia—the author of *Jones*—noted, "[t]here is nothing new or surprising in the proposition that our unchanging Constitution refers to other bodies of law that might themselves change."  *Georgia v. Randolph*, 547 U.S. 103, 144 (2006) (Scalia, J., dissenting).  So to the extent the Fourth Amendment looks to state common law, its protection is pegged to an evolving body of law.[5]  Courts must therefore look to the current common law of trespass to see how existing property rights cash out under the Fourth Amendment.  *See Carpenter v. United States*, 585 U.S. 296, 402 (2018) (Gorsuch, J., dissenting).

---

[5]I share Judge Hermandorfer's concern that tying Fourth Amendment doctrine to evolving state law could induce states "to stack the deck for or against police" by, for example, redefining trespass to prohibit longstanding and traditionally permitted police practices.  Hermandorfer Conc. at 32.  But as the Supreme Court has noted elsewhere, one "state law cannot be the only source" of content when the Constitution refers to common law.  *Tyler*, 598 U.S. at 638.  Rather, we look to broader common-law principles, history, and precedent to ensure states don't define away long-authorized practices—like dog sniffs.  *Id.*

This is consistent with how we think about the Fourth Amendment's property-focused neighbor—the Fifth Amendment. The Fifth Amendment requires the government to pay "just compensation" for any "private property . . . taken for public use." U.S. Const. amend. V. But to determine what counts as private property, we look to existing state law. *See Roth*, 408 U.S. at 577; *Slaybaugh*, 114 F.4th at 598. Thus, as that property law evolves, the types of claims plaintiffs can bring under the Fifth Amendment also evolve. So too with the Fourth Amendment. Hence "a latter-day alteration" of common-law trespass can rightly "produce a latter-day alteration of the Fourth Amendment outcome—without altering the Fourth Amendment itself." *Randolph*, 547 U.S. at 143 (Scalia, J., dissenting); *accord* Sacharoff, *supra*, at 891 ("*Jones* seems to envision a trespass test based upon contemporary state law trespass principles.").

Tying the Fourth Amendment's protection to current common law also conforms to the original remedial structure behind the Bill of Rights. After all, the Fourth Amendment existed for over a century before the Supreme Court created the suppression remedy. *See Weeks v. United States*, 232 U.S. 383, 393 (1914). At the Founding, the Fourth Amendment could only be vindicated following a violation of existing law. *See Utah v. Strieff*, 579 U.S. 232, 237 (2016); *Chaney-Snell v. Young*, 98 F.4th 699, 717 (6th Cir. 2024); William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821, 1840 (2016). It went like this: An official would commit a tort, like trespass. The victim would sue under then-existing common law. *See* Sacharoff, *supra*, at 896–97 (observing that the plaintiffs in both *Entick* and *Wilkes* sued for trespass). In response, the official would raise government immunity as a defense. And to defeat that immunity, the plaintiff would argue that the official had violated the Fourth Amendment. *See Morgan*, 903 F.3d at 574 n.2 (Thapar, J., concurring in part and dissenting in part); Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 625–27 (1999). So the Fourth Amendment, as originally understood and implemented, was invoked following a common-law violation. With no independent suit available, there was no remedy to vindicate Fourth Amendment protections. *See* Bradford P. Wilson, *Enforcing the Fourth Amendment* 16 (1986) (noting "[t]he framers assumed that" the need for Fourth Amendment remedies "was met by the remedial aspect of the common law"). Although the Supreme Court has now told us to enforce the Fourth Amendment differently, it makes sense that

the Fourth Amendment's scope tracks the common law in place at the time of the alleged violation.

D.

Even assuming that current common law controls, *Jones* left open another question. The Fourth Amendment violation in *Jones* hinged on whether placing a GPS device on a car for an extended period counted as a trespass to chattels. But state law recognizes two types of common-law trespass. One allows you to sue in court because the trespass damages or dispossesses you of your property. The other only allows you to take some action—i.e., defense of property—because the intrusion doesn't cause damage or dispossession. *See* Restatement (Second) of Torts § 217 cmt. a ("[A] trespass, though not actionable . . . may nevertheless be important in the determination of the legal relations of the parties."). Yet *Jones* doesn't tell us which one is relevant for Fourth Amendment purposes.

Take property-defense law in Texas. There, a trespass to chattels can occur even when there is only an intentional harmless intrusion—like laying a hand on someone's car. *See Zapata v. Ford Motor Credit Co.*, 615 S.W.2d 198, 201 n.4 (Tex. 1981). And that can justify the owner using force to remove the intrusion—like knocking the hand off the car. *Id.*; *accord* Restatement (Second) of Torts § 77. But to sue in court for trespass to chattels, Texas requires that a plaintiff show damage to his property or dispossession thereof. *See Zapata*, 615 S.W.2d at 201 & n.4. Harmless intrusion isn't enough. So the Fourth Amendment question is this: Which kind of trespass to chattels does *Jones* require?

Again, the Amendment's original remedial structure may provide the answer. Because the Fourth Amendment was only vindicated at the Founding by bringing a suit under existing law, a trespass that merely changed the legal relationship between parties wouldn't have been enough. A plaintiff needed to get into court before he could litigate the Fourth Amendment. Consider a Founding-era hypothetical. A constable harmlessly puts his hand on a citizen's horse, and the owner bats it away. And suppose then-existing law resembled Texas's law. Without damage to the horse (or dispossession), the owner can't bring suit. If he can't bring suit, then he can't vindicate his Fourth Amendment rights. So the Founding-era remedial scheme would

provide no remedy for a Fourth Amendment violation, even if the constable had theoretically committed a trespass to chattels.

In short, the Founding-era remedial scheme allowed a citizen to vindicate his Fourth Amendment rights only after an *actionable* common-law violation—not just when the elements of common-law trespass to chattels were met. Today, that distinction likely also applies to the *Jones* test. A Fourth Amendment violation thus occurs when officials commit a trespass to chattels that is actionable in court under current common law.

E.

That brings us to the present. What does current law require for a trespass-to-chattels suit? The answer is clear: A plaintiff must suffer harm before he can bring a claim in court. That harm can occur through the defendant either *damaging* the chattel or temporarily *dispossessing* the owner of the chattel. *See* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 14, at 87 (5th ed. 1984) (requiring "damage to the chattel" or "loss of possession . . . even if only for a brief interval"); Restatement (Second) of Torts § 218 (similar). In contrast, no trespass claim arises when there is "a mere harmless intermeddling with goods." *Harper, James and Gray on Torts* § 2.3 (3d ed. 2025) (requiring "physical harm," "destruction," or "dispossession" for a trespass-to-chattels claim).[6]

Consider the law of Kentucky—where the officers stopped Fellmy. One Kentucky treatise summarizes that a trespass-to-chattels claim arises when a defendant interferes with the chattel and "(a) dispossesses the plaintiff of the property, (b) deprives the plaintiff of the use of the property for a substantial time, (c) impairs the property as to its condition, quality, or value, or (d) causes physical harm." 13 David J. Leibson, *Kentucky Practice Series Tort Law* § 7:1 (2025–2026 ed.); *accord Madison Cap. Co. v. S & S Salvage, LLC*, 794 F. Supp. 2d 735, 740 (W.D. Ky. 2011) (defining trespass to chattels as "intentionally dispossessing another of [the] chattel or using or intermeddling with a chattel in the possession of another" (quotation

---

[6]It seems likely that requiring damage or dispossession to bring an action for trespass to chattels also accords with the Founding-era rule. *See* Keeton, et al., *supra*, at 87; *Marentille v. Oliver*, 2 N.J.L. 379, 379 (1808). But either way, it cashes out the same today because current common law controls whether officers violated the Fourth Amendment.

omitted)), *aff'd*, 507 F. App'x 528 (6th Cir. 2012). And Kentucky courts note that trespass to chattels requires at least "minor damages or deprivation." *Weatherly v. Hospice of Lake Cumberland, Inc.*, No. 2018-CA-000248, 2019 WL 1422848, at *2 (Ky. Ct. App. Mar. 29, 2019) (quoting Leibson, *supra*, § 7:1); *see also Madison Cap.*, 507 F. App'x at 539.

Kentucky isn't an outlier. Other states also require damage or dispossession to make out a trespass-to-chattels claim. Arizona, for instance, demands a showing that the "plaintiff was harmed by [the] defendant's conduct." *McAlister v. Loeb & Loeb, LLP*, 571 P.3d 891, 902 (Ariz. 2025). And in California, a trespass to chattels occurs when "an intentional interference with the possession of personal property has proximately caused injury." *Jamgotchian v. Slender*, 89 Cal. Rptr. 3d 122, 134 (Ct. App. 2009) (cleaned up). Texas, following the Second Restatement, similarly requires "actual damage to the property" or that the owner be deprived "of the [property's] use for a substantial period of time." *Zapata*, 615 S.W.2d at 201. Courts in New York, Ohio, and Maine agree. *See Sch. of Visual Arts v. Kuprewicz*, 3 Misc. 3d 278, 281 (N.Y. Sup. Ct. 2003); *Mercer v. Halmbacher*, 44 N.E.3d 1011, 1018 (Ohio Ct. App. 2015); *Cap. City Renewables, Inc. v. Piel*, 335 A.3d 588, 598 n.7 (Me. 2025).

Plugging this common-law requirement into the *Jones* test, we get the following rule: A Fourth Amendment search occurs when officers "trespass" onto constitutionally protected property to discover information and, in doing so, damage the property or temporarily dispossess the owner of it. *See Jones*, 565 U.S. at 407–11 & n.5.

F.

Thus, under *Jones*, the officers didn't unlawfully search Fellmy's car. Despite Tyra jumping on Fellmy's doors, no trespass occurred because the jump neither dispossessed Fellmy of his property nor damaged it. For one, Tyra's jump didn't dispossess him of his property. Fellmy had been legally pulled over, and he retained possession of the car regardless of whether Tyra momentarily touched its exterior. And her jump didn't damage Fellmy's vehicle, either. Tyra's front paws made only brief contact with the driver and passenger windowsills, and there is no evidence of scratches or any other harm to Fellmy's car. So no Fourth Amendment search occurred, and the drug evidence shouldn't have been suppressed.

## G.

Still, this interpretation of *Jones* has its own problems. If we tie Fourth Amendment violations to damage, then does the permissibility of a dog sniff turn on whether the dog scratched the car? And how much of a scratch is enough to implicate the Fourth Amendment? Defendants may end up litigating the condition of their car's paint job to try to suppress trial evidence.[7]

What's more, establishing a common-law foundation for interactions between citizens and officers could lead to incoherent questions. Look at the law of property defense. Could a driver really push off a police dog that had jumped onto his car by claiming the jump met the elements of a harmless trespass to chattels? Or what if the officer laid his hand on a defendant's car—would the common law justify the owner batting the officer's hand away? It's dubious that state common law best contemplates the unique deference that drivers owe officers following a lawful police stop.

Relatedly, this interpretation may rely on unrealistic assumptions about what law enforcement officers should be expected to know or consider. As the Supreme Court has recognized, traffic stops are "dangerous encounters" and frequently lead to officers being assaulted or even killed. *Maryland v. Wilson*, 519 U.S. 408, 413 (1997). So do we really want officers to mentally survey the common law of different states while they are conducting dog sniffs or other investigatory techniques? Should we even expect them to know that? *See Rudolph v. Babinec*, 939 F.3d 742, 755 (6th Cir. 2019) (Thapar, J., concurring in part and dissenting in part). In these cases, bright-line rules about how officers can conduct traffic stops would be preferable.

---

[7]Of course, these issues are a product of the Supreme Court's creation of the Fourth Amendment suppression remedy. Why? Because under the Fourth Amendment's original remedial scheme, a citizen would litigate damage to his property in a separate tort suit against the officer who committed the violation—not as a way to keep evidence out of a criminal prosecution. So introducing evidence in Founding-era criminal proceedings wouldn't turn on the specifics of state tort claims. And any resulting damage to a car, for example, would be litigated where it belongs—in a tort suit.

H.

Anyone who has read to this point can understand that these doctrines are messy. And courts have approached the questions raised by *Jones* and *Katz* from many different directions. *See* Orin Kerr, *The Two Tests of Search Law*, 103 Wash. U. L. Rev. 309, 311 (2025); Amar, *supra*, at 761–800. In that light, Professor Orin Kerr has attempted to harmonize these doctrines around another theory: asking whether officials' actions constituted an "intrusion." *Id.* at 350. This test comes from a doctrinal through-line within Supreme Court precedent and appears to underlie most Fourth Amendment search cases. Since even before *Katz*, the Court has repeatedly used the term "intrusion" when considering what actions count as a search. *See, e.g.*, *Silverman v. United States*, 365 U.S. 505, 509 (1961) (finding a search where there is a "physical intrusion"); *Jardines*, 569 U.S. at 7 (same with an "unlicensed physical intrusion"); *Grady v. North Carolina*, 575 U.S. 306, 310 (2015) (per curiam) (same when a device "physically intrud[es] on a subject's body"). And focusing on "intrusions" has the benefit of avoiding both the amorphous privacy inquiry of the *Katz* test, and the potentially "unpredictable" property-based questions under *Jones*. Kerr, *supra*, at 313, 322. Yet this theory could still reach many of the same results as existing doctrine by finding that a search occurred when officials physically intruded into a citizen's property or committed an equivalent intrusion through "modern technological equivalents." *Id.* at 350.

So how would the "intrusion" test play out here? The through-line of Supreme Court cases tells us that Tyra's touching and sniffing of the car wasn't a search. First, dog sniffs are "much less intrusive than a typical search." *Place*, 462 U.S. at 707. That makes sense. After all, dog searches only tell us whether contraband is present. And there is no "legitimate privacy interest" in contraband. *Illinois v. Caballes*, 543 U.S. 405, 409–10 (2005). Contrast that with officers simply rummaging through the car, which allows officers to see not only contraband, but also much more. Second, drivers of cars have a diminished expectation of privacy because cars are mobile and drive on public roads. *See California v. Acevedo*, 500 U.S. 565, 571 (1991). Finally, the officers didn't direct Tyra to intrude *into* the cabin of the car. Rather, the officer only tapped the outside of the car. Tyra put her nose through the window on her own and without direction. Taken together, these actions don't amount to the type of intrusion the

Supreme Court has classified as a search. So under my understanding of Professor Kerr's approach and the underlying caselaw, the officers didn't commit a Fourth Amendment search.

II.

The officers in this case didn't violate the Fourth Amendment. But even if they had, that wouldn't be the end of our inquiry. Instead, we would ask whether suppressing the drugs from Fellmy's trial would have been an appropriate remedy. It wouldn't. That's because the officers acted in good faith when they led Tyra around Fellmy's car.

Unfortunately, the government failed to raise this argument. The Supreme Court has reminded us that we generally shouldn't decide issues not raised by the parties, so the per curiam opinion declines to reach this question. *See Wood v. Milyard*, 566 U.S. 463, 473 (2012). Still, this could have been a much easier case if the government had raised the good-faith issue.

To see why, consider the suppression remedy. Violations of the Fourth Amendment don't "automatically" warrant suppression. *Herring v. United States*, 555 U.S. 135, 147 (2009). To the contrary, suppression is a "last resort." *Davis v. United States*, 564 U.S. 229, 237 (2011) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). That's because suppression is a judicially created remedy "designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Herring*, 555 U.S. at 139–40 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). And that remedy has a substantial cost to society: It conceals true, relevant evidence and can let dangerous criminals back into their communities scot-free. *See Davis*, 564 U.S. at 237. So when we consider whether to suppress evidence, "the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Herring*, 555 U.S. at 137. It's only appropriate when its deterrent effect on unlawful police conduct outweighs the substantial costs of suppression. *Id.* at 140–41.

Suppression survives that balancing test in relatively few cases. When police violate a defendant's rights "deliberately, recklessly, or with gross negligence," then suppression may be warranted. *Davis*, 564 U.S. at 240. In those cases, the Supreme Court has found that suppression is "worth the price paid by the justice system" because of its potential to deter future violations. *Id.* (quoting *Herring*, 555 U.S. at 144). On the other hand, when officers have a

"reasonable good-faith belief" that their actions are lawful or when their violations are merely negligent and "isolated," suppression isn't worth the cost. *Id.* at 238 (quotations omitted). And to find whether that good-faith belief existed, we often look to existing precedent. *Id.* at 239.

The costs of suppression here far exceed the benefits of deterrence. That's because Officer Shelton acted with a good-faith belief that his actions were lawful when he conducted Tyra's drug sniff. The Supreme Court has long held that dog sniffs generally aren't Fourth Amendment searches when police have lawfully stopped a car. *See, e.g.*, *Caballes*, 543 U.S. at 409; *Place*, 462 U.S. at 707. While *Sharp* implied that a search may occur when an officer directs a drug dog to jump into the interior of a car, we've never held that a mere dog sniff through an open window constitutes a search. *United States v. Sharp*, 689 F.3d 616, 618 (6th Cir. 2012). After Fellmy was lawfully pulled over, Officer Shelton reasonably followed the Supreme Court's longstanding guidance when he led Tyra around Fellmy's car and directed her to sniff through an open window.

Likewise, *Jones* and its progeny wouldn't have alerted a "reasonably well-trained officer" that Shelton's actions were unlawful. *United States v. Leon*, 468 U.S. 897, 923 (1984); *see Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019). For starters, neither placing a GPS on a car nor chalking tires involves dogs. *Jones*, 565 U.S. at 403, 405 (trespass via GPS tracker); *Taylor*, 922 F.3d at 332 (trespass via chalk). What's more, the brief contact here is distinguishable from the continuous contact in *Taylor* and *Jones*. Unlike the chalk lines on tires in *Taylor*, Tyra didn't leave any marks behind. 922 F.3d at 332–33. And unlike the GPS tracker stuck to the bottom of a car for four weeks in *Jones*, Tyra jumped on Fellmy's door for only a few seconds. 565 U.S. at 403. So a reasonable officer could have concluded that directing a dog to briefly set its paws on a door—leaving nothing behind—didn't run afoul of the Fourth Amendment.

And that conclusion is even more reasonable considering the common law's requirement of dispossession or damage to make out a trespass claim. To justify suppression here, we'd need to expect a police officer to extend existing precedent to a novel fact pattern and disregard the common law. But that's precisely the type of prediction that we don't expect officers to make. *See Rudolph*, 939 F.3d at 755 (Thapar, J., concurring in part and dissenting in part) (noting that

law enforcement must apply caselaw while "protect[ing] the public in an uncertain and dangerous world, not the cold crucible of the courtroom").

At bottom, Officer Shelton didn't commit the type of deliberate, reckless, or grossly negligent conduct that suppression is designed to deter. *See Davis*, 564 U.S. at 240. So it wouldn't make sense to punish society—by suppressing evidence used to enforce its laws— when the officers themselves wouldn't have known their conduct violated the Fourth Amendment.

\*          \*          \*

When *Jones* tied the Fourth Amendment to the common law, it hewed closer to the Amendment's original meaning. But it also opened a can of worms that lower courts must work through. This case illustrates how those questions shake out for an important investigative tool: dog sniffs. In short, dog sniffs don't violate the Fourth Amendment's original meaning when the drug dog makes harmless contact with a suspect's car.

---

**CONCURRENCE**

---

HERMANDORFER, Circuit Judge, concurring. I agree that Fellmy's Fourth Amendment argument fails for the reasons the per curiam opinion provides. I also agree with much of Judge Thapar's thoughtful concurrence. I write to flag the additional problems I see with Fellmy's technical-trespass theory as applied to the commonplace practice of open-air dog sniffs.

I

"[T]he Fourth Amendment has to be applied on the spur (and in the heat) of the moment." *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001). So the Supreme Court frequently blesses general categories of investigatory actions in ways knowable "beforehand." *New York v. Belton*, 453 U.S. 454, 458 (1981) (citation omitted); *see Atwater*, 532 U.S. at 347. The result can preference bright-line rules, even when "each case" may not present "one of the reasons supporting the authority" for permitting the conduct at issue. *United States v. Robinson*, 414 U.S. 218, 235 (1973). The Supreme Court's approach to regulating law-enforcement practices, in short, often favors plain guidance over more "qualified," fact-intensive tests lacking ready "application by the officer in the field." *Belton*, 453 U.S. at 458 (citation omitted).

Here, we're asked to invalidate detection-dog Tyra's open-air sniff of Fellmy's vehicle at a lawful traffic stop. I'd therefore treat as most probative the Supreme Court's general approach to that category of investigatory activity. And in a series of cases going back decades, the Supreme Court has reiterated that dog sniffs of vehicles and effects in public places are "*sui generis*" investigatory actions that do not effectuate a Fourth Amendment "search." *United States v. Place*, 462 U.S. 696, 707 (1983).

The Court's first majority opinion dealing with the legality of dog sniffs came over forty years ago in *Place*. There, the Court reasoned that a dog sniff of luggage in a public airport "did not constitute a 'search' within the meaning of the Fourth Amendment." *Id.* So too, in *City of Indianapolis v. Edmond*, the Court observed that "walk[ing] a narcotics-detection dog around the

exterior of" a car at a checkpoint "does not transform the seizure" of the car "into a search." 531 U.S. 32, 40 (2000). More recently, in *Illinois v. Caballes*, the Court reiterated that a "dog sniff conducted during a concededly lawful traffic stop" is "not a search subject to the Fourth Amendment." 543 U.S. 405, 408, 410 (2005).

The Court's justification for that rule is threefold. First, open-air dog sniffs do not require "opening" private effects. *Place*, 462 U.S. at 707; *see also Edmond*, 531 U.S. at 40 ("[A] sniff by a dog that simply walks around a car is much less intrusive than a typical search.") (citation omitted). Second, they do not "expose noncontraband items that otherwise would remain hidden from public view." *Caballes*, 543 U.S. at 409 (quoting *Place*, 462 U.S. at 707). And third, they "reveal[] no information other than the location of a substance that no individual has any right to possess." *Id.* at 410; *see also Place*, 462 U.S. at 707. To the Court, that last feature distinguished dog sniffs from other tools—like the thermal-imaging device in *Kyllo v. United States*, 533 U.S. 27 (2001)—"capable of detecting lawful activity" including the "intimate details in a home." *Caballes*, 543 U.S. at 409-10.

To be sure, some have criticized the Supreme Court's rationales for deeming dog sniffs to be non-"searches."[1] Others object to the routine use of investigatory dog sniffs as a matter of policy. *See, e.g.*, Irus Braverman, *Passing the Sniff Test: Police Dogs as Surveillance Technology*, 61 Buff. L. Rev. 81, 94-98 (2013). But unless revisited by the Court, the precedents governing open-air dog sniffs of vehicles and other effects continue to supply lower courts with the general Fourth Amendment rule for assessing that category of law-enforcement activity. And the rule is that such sniffs generally are not "searches" in the constitutional sense.[2]

---

[1]*See, e.g.*, *Caballes*, 543 U.S. at 413 (Souter, J. dissenting); Lewis R. Katz & Aaron P. Golembiewski, *Curbing the Dog: Extending the Protection of the Fourth Amendment to Police Drug Dogs*, 85 Neb. L. Rev. 735, 737-38 (2007).

[2]For now, that non-"search" rule suffices to reject Fellmy's contentions. If it turns out that open-air dog sniffs are sometimes "searches," their unique characteristics might factor into the reasonableness analysis—either as a per se matter or in the mine run of cases. *See* Thapar Concurrence 3 n.2. Or perhaps such sniffs are more like encounters under *Terry v. Ohio*, 392 U.S. 1 (1968), and thus require only reasonable suspicion of drug activity rather than probable cause. Whether those alternative pathways might sustain the Fourth Amendment validity of open-air dog sniffs could be worth exploring if the Supreme Court revisits its non-"search" rule.

II

Fellmy counters that *United States v. Jones*, 565 U.S. 400 (2012), and *Florida v. Jardines*, 569 U.S. 1 (2013), have altered the going framework. They do so, he claims, by mandating a trespass-focused approach that would render any open-air dog sniff a "search" whenever a canine commits a technical trespass to chattels—no matter how minor or incidental—under state common law. Though some courts have agreed,[3] I see good reasons to demur.

For starters, neither *Jones* nor *Jardines* confronted the legality of open-air dog sniffs in the chattels or traffic-stop context. So neither gave the Supreme Court any occasion to revisit its settled holding that such sniffs are not Fourth Amendment "searches."

Nor does the reasoning of *Jones* or *Jardines* call into question every dog sniff in which a dog contacts a vehicle. *Jones* dealt with "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements." 565 U.S. at 404 (footnote omitted). The device's sustained physical occupation, and the attendant surveillance enabled by "attaching the device," was thus the crux of the dispute. *Id.* at 410; *see also id.* at 413-14 (Sotomayor, J., concurring) ("The Government usurped Jones' property for the purpose of conducting surveillance on him."). Neither factor is present here, suggesting that a canine's fleeting contact during a sniff does "not involve an extended physical occupation or physical intrusion akin to that in *Jones*." *State v. Bauler*, 8 N.W.3d 892, 900 (Iowa 2024).

*Jardines*, for its part, applied property-law concepts in determining that a dog sniff on a home's curtilage is a search. 569 U.S. at 6-9. But *Jardines*'s analysis is ill fitted for the traffic-stop context. *Jardines* begins with the "the right of a man to retreat into his own home"—which carries with it the ability to exclude unwanted visitors from property. *Id.* at 6 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). That doesn't translate to traffic stops. All agree that officers may lawfully separate owners from their vehicles by issuing an "order to get out of the car," *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)—dispossession that would otherwise

---

[3]*See, e.g., State v. Dorff*, 526 P.3d 988, 991 (Idaho 2022); *State v. Organ*, --- S.W.3d ----, 2025 WL 3029069, at *1 (Tex. Crim. App. 2025). *But see State v. Bauler*, 8 N.W.3d 892, 894-95 (Iowa 2024).

constitute a trespass to chattels at common law, *see* Restatement (Second) of Torts §§ 218, 221 (1965). Continuing with its home-centric framing, *Jardines* next rejects that "introducing a trained police dog to explore the area around the home" falls within the scope of visitors' implied license to approach a home's front door. 569 U.S. at 9. As discussed, however, the Supreme Court's caselaw grants officers *express* permission to perform that same kind of investigatory dog sniff of lawfully stopped vehicles. *See Caballes*, 543 U.S. at 409.

It is true that, post *Jones* and *Jardines*, the Supreme Court has not expressly addressed the trespass-to-chattels issue in the context of dog sniffs. And it may be that certain dog intrusions—say, fully jumping into vehicles to search compartments not accessible via an external sniff—stray too far into "search" territory. Nor can courts ignore other limits, like those on suspicionless stops or unreasonably long seizures, that continue to implicate and regulate the use of detection dogs. *See Edmond*, 531 U.S. at 40-42; *Rodriguez v. United States*, 575 U.S. 348, 350 (2015).

But as the *Jones* Court acknowledged, it broke no new ground by using general principles of property to inform the Fourth Amendment's protections. *See* 565 U.S. at 405-07; *see also* Orin S. Kerr, *The Two Tests of Search Law: What is the* Jones *Test, and What Does That Say About* Katz, 103 Wash U. L. Rev. 309, 314-33 (2025) (detailing role of physical-intrusion-based theories). Nor are trespass-based challenges to dog sniffs themselves novel. *United States v. Bronstein*, 521 F.2d 459, 461-62 (2d Cir. 1975) (reasoning that, though detection dog's "nipping and biting at the bags . . . may well have constituted a technical trespass, it cannot sensibly be characterized as a search or seizure") (internal citation omitted). After all, it is often the case that dogs briefly contact or breach the window threshold of effects and vehicles during an external sniff—whether incidentally or by instinct,[4] to enable an effective sniff,[5] or as a "classic" means to signal a positive alert. *United States v. Williams*, 726 F.2d 661, 664 (10th Cir. 1984).[6]

---

[4]*See, e.g.*, *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989).

[5]*See, e.g.*, *United States v. Keller*, 123 F.4th 264, 266 (5th Cir. 2024) (canine "placed his paws on the rear bumper of the vehicle and sniffed near the back hatch").

[6]*See also, e.g.*, *United States v. $639,558*, 955 F.2d 712, 713 (D.C. Cir. 1992) (canine was "trained to signal the presence of drugs" by "scratching at a door with his paws").

Yet until recently, courts have overwhelmingly disagreed that such canine contact triggers Fourth Amendment coverage.**[7]** That decades' long judicial consensus provides another reason to pause before reading the Supreme Court to have tacitly overhauled its Fourth Amendment dog-sniff framework. *Cf. Torres v. Lynch*, 578 U.S. 452, 467-70 (2016).

## III

Of course, if a particular investigatory method violates the Fourth Amendment, the "antiquity" of the tools used is no defense. *Jardines*, 569 U.S. at 11. So too, if *Jones*'s property-centric approach tees up "difficult questions" for future cases, Thapar Concurrence 2 n.1, lower courts must resolve them. But when assessing whether *Jones* mandates Fellmy's technical-trespass approach, it seems worth considering the doctrinal and practical problems Fellmy's position would produce. And as I see it, the doctrinal and practical "fallout" from Fellmy's "interpretation" further "underscores the implausibility" of that reading. *Van Buren v. United States*, 593 U.S. 374, 394 (2021).

Applying a technical-trespass rule to open-air dog sniffs not only creates tension with the Supreme Court's prior endorsement of that investigatory technique. It also runs counter to more general Fourth Amendment principles. Limits on police should, when possible, be "readily administrable." *Atwater*, 532 U.S. at 347. But Fellmy's position would have the Fourth Amendment analysis rest on arcane property rules that are both difficult to parse ex ante (*e.g.*, Is damage to, as opposed to mere contact with, chattels necessary for trespass to lie?**[8]** Does trespass on the close apply to chattels?**[9]**) and difficult to translate to the policing context (*e.g.*, Does intermeddling with a chattel confer a right to sue, or a right to defend property with force? *See* Thapar Concurrence 9-10). Fellmy's approach also runs into the Court's refusal to hinge the

---

**[7]***See, e.g.*, *Olivera-Mendez*, 484 F.3d at 511-12; *Stone*, 866 F.2d at 364; *United States v. Goldstein*, 635 F.2d 356, 359, 360-61 (5th Cir. 1981); *United States v. Venema*, 563 F.2d 1003, 1006 (10th Cir. 1977); *Bronstein*, 521 F.2d at 461-62; *United States v. Fulero*, 498 F.2d 748, 749 (D.C. Cir. 1974).

**[8]***Compare Weatherly v. Hospice of Lake Cumberland, Inc.*, 2019 WL 1422848, at *2 (Ky. Ct. App. Mar. 29, 2019) ("Trespass to chattels involves relatively minor damages or deprivation.") (citation omitted), *with Stanley v. Knuckles*, 2017 WL 6398296, at *4 (Ky. Ct. App. Dec. 15, 2017) ("[O]ne need not intentionally *damage* the property to commit the tort" of trespass to chattels.).

**[9]***Compare Organ*, 2025 WL 3029069, at *9 (no), *with Dorff*, 526 P.3d at 997 (yes).

"search" inquiry on the existence of "a technical trespass" under local law. *Silverman*, 365 U.S. at 511.

Doctrinal trouble would only multiply if our focus is to be on each State's modern-day trespass law—an interpretation Fellmy at points suggests and Judge Thapar's concurrence entertains. Such an evolving-trespass approach would mean the "protections of the Fourth Amendment" "vary from place and from time to time"—variability the Supreme Court has previously said it "cannot accept." *Whren v. United States*, 517 U.S. 806, 815 (1996). It also would cause the Constitution's meaning to expand and contract as States modify trespass rules to stack the deck for or against police. *But cf. Virginia v. Moore*, 553 U.S. 164, 176 (2008) ("state restrictions" on law-enforcement practices "do not alter the Fourth Amendment's protections."). I hesitate to conclude that States could effectively abrogate *Place*, *Edmond*, and *Caballes*'s federal constitutional-law holdings by defining open-air canine sniffs as trespasses under state law.

The head-scratching practical consequences of Fellmy's position raise further red flags. The per curiam opinion and Judge Thapar detail the oddities well. To sum up, Fellmy's view would often rest the "search" inquiry on facts outside of officers' control (*e.g.*, Did a car's positioning or size necessitate K-9 contact? Were the windows left open?). The "characteristics of the individual officer"—or canine—"conducting" the investigation could likewise dictate different Fourth Amendment treatment in the same investigatory circumstances. *Rodriguez*, 575 U.S. at 362 (Thomas, J., dissenting). "[S]uch trivialities," however, should not drive the "search and seizure protections of the Fourth Amendment." *Whren*, 517 U.S. at 815. Here as elsewhere, Fellmy identifies no good "reason to ascribe to the Fourth Amendment such arbitrarily variable protection." *Devenpeck v. Alford*, 543 U.S. 146, 154 (2004).

Consider also the bizarre multi-track regime Fellmy's technical-trespass rule would create. Under it, officers would need at most reasonable suspicion to initially perform an open-air sniff during a traffic stop. *See, e.g.*, *United States v. Jordan*, 100 F.4th 714, 718 (6th Cir. 2024) ("To prolong a traffic stop" to "perform a drug-dog sniff," officers "must have reasonable suspicion of additional wrongdoing."). That showing would suffice, moreover, so long as the canine managed to avoid any incidental contact with a vehicle. *Caballes*, 543 U.S. at 407-09.

But officers would suddenly need probable cause to continue or justify the sniff as soon as a dog propped itself up against the car or broke the plane of the window. *See, e.g.*, *State v. Organ*, --- S.W.3d ----, 2025 WL 3029069, at *1 (Tex. Crim. App. 2025). Yet if officers had probable cause to believe drugs were present, they could have simply searched the vehicle's interior from the start—no canine needed. *Collins v. Virginia*, 584 U.S. 586, 592 (2018). And if officers pull or lead a dog away from a vehicle to avoid contact? They risk accusations of having "cued" the dog in a way that "undermine[s]" the reliability of any positive alert. *Florida v. Harris*, 568 U.S. 237, 247 (2013).[10] How officers should navigate those hoops, particularly given the "danger" inherent in traffic stops, is anyone's guess. *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (citing *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)). So is the amount of new litigation—over whether canine contact occurred, caused damage, was necessary to facilitate a positive sniff, or came before or after an alert—Fellmy's rule would necessitate.

Nor are these complications any small matter. Given their longstanding legality, open-air sniffs by detection dogs now play a critical role in law-enforcement efforts nationwide. *See* Brief of Nat'l Police Canine Ass'n, at 1, *Florida v. Harris*, 568 U.S. 237 (2013) (No. 11-817). Their use spans from interdicting explosives at the border, to stopping the flow of dangerous drugs into communities, to securing the safety of public officials, transit stations, and stadiums. *Dogs of DHS: How Canine Programs Contribute to Homeland Security*, *Hearing Before S. Comm. on Homeland Sec. & Govt. Affairs*, 114th Cong. (2016) (testimony of Kimberly Hutchinson and Damian Montes). Here, canine Tyra helped a small police department recover around 180 grams of pure methamphetamine. That is more than three times the quantity needed to trigger the mandatory federal maximum sentence and equates to over a thousand individual doses. *See* 21 U.S.C. § 841(b)(1)(A)(viii).

Fellmy's technical-trespass position would thus inject unpredictability and confusion into innumerable law-enforcement interactions. And when combined with the exclusionary rule, it also risks suppression of essential drug evidence in scores of cases. I agree with today's

---

[10]*See, e.g.*, *United States v. Smith*, 355 F. Supp. 3d 544, 552-53 (N.D. Miss. 2018); *United States v. Heir*, 107 F. Supp. 2d 1088, 1091 (D. Neb. 2000); *cf. United States v. Metts*, 2022 WL 1421370, at *10 (N.D. Ind. May 4, 2022) ("releas[ing] the leash before" the alert "eliminat[es] any forceful argument that the canine had been improperly 'cued'").

rejection of a Fourth Amendment rule that would hamstring longstanding law-enforcement practices based on happenstance facts bearing little on interference with property rights.